Andrew M. Calamari
Sanjay Wadhwa
George N. Stepaniuk
Richard Hong
Ladan F. Stewart
Chevon N. Walker
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0956 (Hong)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | Civil No. |
| Plaintiff, | : | |
| | : | ECF CASE |
| | : | |
| -against- | : | COMPLAINT AND JURY |
| | : | DEMAND |
| JAMES H. IM, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendant James H. Im ("Im" or "Defendant"):

## SUMMARY OF ALLEGATIONS

1.      This case involves fraud committed by Im while buying and selling commercial

mortgage backed securities ("CMBS") during the time he was co-head of the CMBS trading desk

("CMBS desk") at Nomura Securities International, Inc. ("Nomura").

2.      Im acted as an intermediary on trades with Nomura's customers who sought to

buy and sell CMBS on the secondary market, with Nomura buying the CMBS from one

customer and then selling the same CMBS to another customer at a higher price. On numerous occasions from 2010 through 2014 (the "relevant period"), Im, while engaged in such trading for Nomura, deliberately misled and lied to customers about, among other things, (i) the prices at which Nomura had bought or sold the securities; (ii) the bids and offers that Nomura made or received on the securities; (iii) the compensation that Nomura would receive for intermediating the trades, in the form of the difference, or "spread," between its purchase and sale prices; and/or (iv) who owned the security, often pretending that he was still negotiating with a third-party seller when Nomura had, in fact, already acquired the security.

3.      In addition to knowingly or recklessly misrepresenting material price information, Im fabricated entire negotiations and conversations with nonexistent third parties in order to embellish his lies, repeatedly describing to customers, who were negotiating to buy CMBS, colorful but entirely fictitious exchanges he supposedly just had with customers who were negotiating to sell that security. In at least one instance, Im bragged to the seller about his purposeful deception of the buyer and asked the seller to remain silent about Im's lie.

4.      Im defrauded investment advisers and other fund managers that were trading CMBS on behalf of clients to whom such advisers and managers owed fiduciary and other duties to obtain the best possible price, as well as financial institutions that were trading CMBS for their own proprietary accounts. The prices at which Nomura's customers bought and sold the CMBS at issue, and the amount of compensation that they thereby agreed to provide Nomura, were material to the customers and investors, and the trading profits for the CMBS desk on those trades were inflated by Im's fraudulent conduct.

5.      Through his fraudulent conduct, Im generated hundreds of thousands of dollars in additional, ill-gotten trading profits for the CMBS desk, which thereby increased his own

compensation. Im received discretionary bonuses during the relevant period that were based, in part, on the performance of the CMBS desk and totaled $3.79 million.

6. By virtue of the conduct alleged herein, Im, directly or indirectly, singly or in concert, violated and aided and abetted Nomura's violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5]. Unless Im is permanently restrained and enjoined, he will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

7. For these violations, the Commission seeks a final judgment against Im ordering permanent injunctive relief, disgorgement with prejudgment interest, civil monetary penalties, and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 22(a), and 22(c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d),77v(a), 77v(c)]; and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Many of the acts, practices, events, transactions, communications, courses of business and other matters alleged

herein occurred in the Southern District of New York, including the material misrepresentations made by Im and the CMBS trades that occurred in connection with those misrepresentations. Moreover, Im resides in the Southern District of New York.

11.     In connection with the conduct alleged in this Complaint, Im, directly or indirectly, singly or in concert, has made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

## DEFENDANT

12.     **Im**, age 40, is a resident of Tarrytown, New York.  He was associated with Nomura as a registered representative from August 2009 through December 2014.  Im was one of two head traders on Nomura's CMBS desk in New York, New York from August 2009 through June 2012, after which he ran the desk alone through December 2014.  During this time, Im held the position of Managing Director, Fixed Income, Securitized Products Trading, Americas.  After leaving Nomura, Im was associated as a registered representative with another broker-dealer, where he currently works.  Before joining Nomura, Im was associated with at least three other broker-dealers as a registered representative or in another capacity, beginning in 1998.  During his career in the securities industry, Im held Series 7, 24, and 63 licenses.

13.     When subpoenaed for documents and testimony in the Commission's investigation, Im asserted his Fifth Amendment privilege against self-incrimination.

## RELATED ENTITY

14.     Nomura, a New York corporation with offices in New York, New York, is a U.S. affiliate of Nomura Holdings, Inc., a public Japanese financial holding company with a principal place of business in Tokyo, Japan.  Nomura has been registered with the Commission as a broker-dealer since 1969 and as an investment adviser since April 2012.

## IM'S KNOWLEDGE OF NOMURA'S POLICIES

15.     As a Managing Director at Nomura, Im received and was otherwise aware of the relevant policies and training materials relating to integrity and accuracy in customer communications when he engaged in the misconduct alleged herein.  One such policy, included in the Compliance Manual for Nomura's Fixed Income Division (of which the CMBS desk was a part), provided as follows:  "All communications with clients (or prospective clients) must be truthful, fair and balanced.  Communications must provide a sound basis for evaluating the facts concerning any particular security or type of security, industry or service.  Communications should never contain false, misleading, unwarranted or exaggerated statements, forecasts, opinions or claims."  Another such policy, included in the Compliance Manual for Nomura Holdings America (of which Nomura was a subsidiary), similarly provided:  "In every context, communications with the public, whether oral, written or electronic, must be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts regarding any particular investment, industry discussed or service offered.  All communications must be truthful, balanced and in good taste, must not omit material facts and must not use language that is misleading, promising, or exaggerated."

16.     In addition, the January 2013 indictment of a trader of mortgage-backed securities at another firm for similar misconduct, news of which was widely circulated among mortgage-backed securities traders, promptly led to further training sessions at Nomura during which Im and other traders were again instructed, among other things, as follows:  "First and foremost for everyone is Do Not Lie."  Notwithstanding such admonition, Im still continued lying to Nomura customers.

17.     Despite his knowledge of the foregoing policies and the requirement that he

comply with those policies, Im deliberately lied to customers to inflate the profits of the CMBS desk and thereby line his own pockets, as detailed below.

## IM'S FRAUDULENT CONDUCT

### Background

18.     Im was one of the two head CMBS traders for Nomura during the relevant period, during which time Nomura was a dealer in CMBS.  Im jointly ran the CMBS trading desk with the other head trader from August 2009 until the other head trader's departure in June 2012, and Im then ran the desk alone until he left Nomura in December 2014.

19.     CMBS are a type of asset-backed securities whose underlying assets are commercial real estate loans.  CMBS are debt obligations and are commonly referred to as bonds.  CMBS were illiquid securities, many of which had been discounted significantly as a result of the 2008 financial crisis.  Starting in 2010, as the economy began to recover, trading volume in the secondary markets for CMBS increased significantly.

20.     The CMBS secondary market was opaque because there was no contemporaneous public dissemination of trade prices, and purchasers and sellers of CMBS had no reliable way to learn the prices that dealers like Nomura brokers paid and received unless the dealers disclosed them while negotiating a trade.  The opaque nature of the secondary market also made investors dependent on dealers like Nomura in locating other buyers and sellers of CMBS.

21.     CMBS prices are typically expressed as a percentage of the face value of the subject bond and the operative increments are expressed in "points" and "ticks," which are equal to 1/32 of a point (or one thirty-second of one percent).  For example, CMBS priced at 70-16 (70 and 16 ticks) means that the price is 70.5% of the bond's face value.

22.     Nomura's CMBS customers were generally investment advisers and other firms

that managed funds that invested in CMBS and other asset-backed securities, and also included

other broker-dealer firms that invested in such securities for their own accounts.

23.     Im typically intermediated trades between buyers and sellers of CMBS, with

Nomura buying the CMBS for its own account from one customer and then selling the same

CMBS to another customer.  On such trades, Im often negotiated Nomura's purchase of CMBS

from one customer and subsequent resale to another customer on the same day.

24.     Im generated a profit for Nomura by buying and selling the security and

collecting the "spread" (or difference) between Nomura's purchase and sale prices, which he

negotiated separately, but often simultaneously, with each counterparty.

25.     In these circumstances, Nomura was typically trading the CMBS as a principal,

but Nomura would generally own the bond for only a limited period of time, and sometimes just

momentarily.  Nomura therefore had minimal, if any, true investment risk, because Im typically

knew that he would be immediately trading that bond to another customer.  Nomura's

counterparties usually agreed to compensate Nomura less for such low-risk, intermediated trades

than for trades in which Nomura had taken on more significant risk.

26.     During trade negotiations, Im often conveyed to one or both counterparties the

other customer's bids to buy or offers to sell the bond, the prices at which Nomura had bought or

sold the bond, and/or the spread (also sometimes referred to by CMBS traders as "commission")

that Nomura would realize from buying and selling the bond.  Im's objective in these

negotiations was to secure both sides of the trade and maximize Nomura's compensation by

maximizing the spread.  The customers' objective generally was to acquire or sell the bond at the

best price while still providing Nomura with a reasonable spread (*i.e.* amount of compensation)

for intermediating the trade.

27.     Based on Im's representations, a potential buyer would often agree to compensate Nomura by paying Nomura an amount above, or "on top" of, the price at which Nomura would be purchasing (or had purchased) the security, and/or the potential seller would sometimes agree to compensate Nomura by selling the security at a price below the price at which Nomura was able to sell the security to the potential buyer. Im could increase the overall spread for Nomura by obtaining compensation from both counterparties in this manner. In these types of situations, Im expressly negotiated the spread that Nomura was to receive with either the buying or selling customer and, in some cases, with both customers simultaneously.

28.     For example, if Im told a potential buyer that Nomura had just bought (or could buy) a bond at 70, the customer might agree to pay Nomura a quarter point (or 8 ticks) by buying the security from Nomura at 70.25 (or 70-08, expressed in ticks). Conversely, if Im told a potential seller that another customer would buy the security at 71, the potential seller might also (or instead) agree to pay Nomura a quarter point (or 8 ticks) on that side of the trade by selling the security to Nomura for 70.75 (or 70-24, expressed in ticks).

29.     In other situations, Nomura and the customer instead negotiated an "all in" price for the security that was intended to include a certain spread for Nomura, often still based, however, on what Im had represented to the customer about Nomura's acquisition cost (or about Nomura's current bid price and/or the seller's current offer price).

30.     Im's negotiations with Nomura's customers often occurred through electronic communications, typically instant messages or Bloomberg chats and occasionally email (which are the sources of all the trade negotiations quoted herein).

31.     The information that Im communicated to Nomura's customers during his negotiations to buy and sell CMBS was material to the customers and to the outcome of the

negotiations.  Because CMBS are illiquid securities and the market for them is opaque, dealers in

CMBS decide if, when and to whom to disclose the bids and offers that they receive or make and

the prices at which they buy and sell the securities.  When Im made statements to Nomura's

customers about Nomura's acquisition or sale price (and by implication, the price at which other

market participants were willing to transact in a bond), or about the all-in price of a CMBS trade,

the customers used that information to inform their own bids and offers and the prices at which

they agreed to buy and sell CMBS in their negotiations with Im.  As such, the statements at issue

here conveyed information that would be important to a reasonable investor, and that was, in

fact, important to Nomura's customers, because those statements significantly altered the total

mix of available information.

**Im's Material Misrepresentations and Deceptive Conduct**

32.     In numerous instances from 2010 through 2014, Im lied to customers about bids

and offers that he made or received for the bonds at issue, the prices that Nomura paid or

received when it bought and sold the bonds and/or Nomura's spread on the trades.  Im

knowingly or recklessly engaged in this fraud in order to inflate Nomura's spread on the trades

without the customers' agreement to, or knowledge of, the actual spreads.  The transactions at

issue generated hundreds of thousands of dollars in additional, fraudulent profit for the CMBS

desk attributable to materially false and misleading statements knowingly or recklessly made by

Im to Nomura's customers.

33.     In many instances, Im fraudulently induced customers buying bonds from

Nomura to increase their bids and to pay more for the bonds than they otherwise would have by

falsely telling them that Nomura would be buying, or had bought, the bonds from another

customer at a price that was higher than the selling customer's actual offer or the price Nomura

had bid or paid.  By lying about these prices, Im misled his customers about, among other things, the amount of compensation that Nomura would receive on the transaction.  On some occasions, the customer expressly agreed on the amount of Nomura's compensation based on, and to be paid "on top" of, the fictitious higher purchase price that Im falsely represented he had paid or needed to pay.

34.    Im also fraudulently induced customers selling bonds to Nomura to lower their offers and accept less for the bonds by falsely conveying lower bids or sale prices to them than he had actually received from the customers that were seeking to buy the bonds from Nomura.

35.    In other instances, Im deceived customers by falsely stating, or otherwise misleading customers into believing, that Nomura was still actively negotiating to buy the bonds at a certain price, when Nomura had already purchased the bonds earlier in the day, or the day before, at a lower price than the price at which he falsely told the customers he was seeking to buy the bond.  In these situations, Im provided the buyer with completely fabricated accounts of the status of the purportedly ongoing negotiations with the seller, including false bid and offer prices and other fictitious (and often colorful) details.

36.    As a result of each of the foregoing assorted types of lies, Im deceived and misled customers into believing that Nomura was receiving less of a spread than it actually was receiving and, in some instances, he expressly misstated the specific amount of the spread.

37.    Im made misrepresentations that falsely implied and, in some cases, expressly misstated spreads ranging from 0.125 to 0.5 point (4 to 16 ticks), while Nomura's actual spreads were up to 8 times more than the implied, misstated, or expressly agreed upon spreads.

38.    The matters about which Im lied were important to the defrauded counterparties and affected their price decisions, negotiating strategies, the price at which the counterparties

ultimately bought or sold the CMBS, and/or the amount of compensation that they actually paid to Nomura.  The misrepresented information thereby had a material impact on the counterparties' decision-making process and price negotiations, leading them to bid and pay higher (or offer and obtain lower) prices for the securities than they would likely have done if Im had not misrepresented, in various ways, the size of the spread that Nomura was obtaining for intermediating the trades at issue.

39.     Im's material misrepresentations and other deceptive misconduct were deliberate and, by engaging in such conduct, he violated the above-mentioned Nomura internal policies and acted contrary to the standards of conduct set forth in the compliance training that he received at Nomura, which required all communications with counterparties and other customers to be truthful and prohibited false, misleading or exaggerated statements to customers and other members of the public.

**Examples of Im's Specific Misrepresentations and Deceptive Conduct**

40.     In numerous transactions, Im deliberately made materially false and misleading statements to (i) the purchasing counterparty about Nomura's purchase price or bid, the seller's offer and/or Nomura's spread after Im had already purchased or agreed to purchase the bonds at a lower price, thereby inducing the buyer to purchase the bond from Nomura at a higher price; or (ii) the selling counterparty about the price at which Nomura's buyer was bidding for the bond and the amount of Nomura's compensation, thereby inducing the seller to sell the bond to Nomura at a lower price.  In one instance, Im even bragged to the seller that he had intentionally misled the buyer by lying about Nomura's purchase price in order to secretly inflate Nomura's profit.

41.     The specific instances in which Im engaged in such fraudulent conduct include

the following transactions, through which he generated a total of at least $366,743 in additional unlawful profits for the CMBS desk.

**Trades 1 and 2**

42.     In a pair of June 27, 2012 bond sales to an investment manager ("Investment Manager A"), Im defrauded Investment Manager A twice in one day by lying to a trader for Investment Manager A ("Trader A") about Nomura's purchase prices for the bonds and Nomura's compensation on the two trades, while also fabricating a fictional negotiation with the source of the bond on the second of these trades.  That day, Im also acknowledged his fraud to the seller of the bond in the first trade and told the seller to keep quiet about Nomura's true purchase price.

*First Trade*

43.     The transaction with Investment Manager A occurred as follows:  Approximately one hour after Im purchased a bond denominated  MLMT 2006-C2 AJ from another party at 78, Trader A asked Im about purchasing that bond for Investment Manager A, and the following dialogue ensued in which Im  lied to Trader A about Nomura's purchase price and its compensation on the trade:

| Trader A: | did you end up buying the [bond]? |
|---|---|
| Im: | still waiting |
| ... | |
| Im: | bot 78-8 |
| ... | |
| Trader A: | what size did you buy on mlmt? |
| Im: | 10mm but only wanna sell 5 |
| Trader A: | we would like to split the 10 with you |
| Im: | i was gonna make it 77/80 |
| Trader A: | i can buy mid at 78.5 |
| Im: | appreciate the bid but i would really like to get compensated more than 8/32 for taking the risk |

44.     A short while later, Investment Manager A purchased the bond from Nomura at

78-24 (78.75).  Because Im falsely told Trader A that Nomura had purchased the bond at 78-8

(78.25) and would only be making eight ticks if Investment Manager A paid 78-16 (78.5), Trader

A increased her bid to 78-24 (78.75) under the false impression that she was thereby agreeing to

provide compensation to Nomura equal to 16 ticks (or one-half point) based on Im's lies about

the cost to Nomura.  However, Nomura's compensation was actually 24 ticks (or three-quarters

of a point), as Im had already purchased the bond for a price of 78, and therefore Im knew his

statements to Trader A were false.

45.    After fraudulently inducing Trader A to buy the bond at 78-24, thereby providing

Nomura with 24 ticks of compensation, Im bragged about his lie to the trader who sold him the

bond ("Seller") and asked him to keep quiet about the true price, as follows:

| | |
|---|---|
| Im: | he paid 78-24 |
| Seller: | per[f]ect |
| Im: | i told him i bot at 78-8 actually |
| Im: | sshhhhh |
| Im: | :-) |
| Seller: | ha |
| Seller: | nice one |

46.    Im's material misrepresentations and deliberate deception generated $12,500 in

additional, fraudulent profit for the CMBS desk on this transaction at the expense of Investment

Manager A.

47.    As shown above, Im's misrepresentations were material because, among other

things, the price information and compensation amount that Im lied about were important to and

influenced Investment Manager A's negotiation strategy and affected the price that Investment

Manager A agreed to pay, and paid, for the bond.

### *Second Trade*

48.    Contemporaneously, Nomura purchased an additional quantity of the same bond

from a different seller at a price of 77-04 (77.125).  After doing so, Im resumed his conversation

with Trader A and again defrauded Investment Manager A by pretending to still be negotiating

to purchase this additional quantity at 78 — nearly a whole point higher than what Nomura had

just paid for it — and thereby leading Trader A to agree to buy the entire piece at 78 and pay

Nomura an additional 4 ticks "on top" of what, unbeknownst to Trader A, was already nearly a

whole point of compensation.  The dialogue went as follows:

> Im:  [Trader A], i think i can bring another 6mm out if u wanna split that too. . . i will bid it back a little
>
> …
>
> Trader A:  sure..would split that with you
>
> …
>
> Im:  heyt so these extra mlmt. . . *i think best i can get em at is 78*. . . what do u think. . . *i tried to talk them lower they are just not biting…saying they can check away*. . . don't want them to do that obvi
>
> Trader A:  we are good at 78
>
> Im:  *u pay me a little on top i assume?. . . 4/32?*
>
> Trader A:  yes..4 ticks good
>
> Im:  k brb [be right back]
>
> Trader A:  hey we can take all 6mm if you want…your choice
>
> Im:  *ok let me get them 1st*
>
> …
>
> Trader A:  thx on mlmt
>
> Im:  *i would have asked u for more than 4/32 on the whole size but lets just say we are even now and move on to the next. . . :-)*
>
> Trader A:  ok cool
>
> Im:  so i sell u 6mm more mlmt 06-c2 aj 78-4
>
> …
>
> Trader A:  yup that sounds good. thx for the trade

(Emphasis added.)

49.     The highlighted statements of Im in this chat underscore the multiple types of

material misrepresentations and deception in which Im deliberately engaged, as well as the effect

that those misrepresentations and deception had on Trader A.  Im knew that his statements were

false, because Im knew that Nomura had already purchased the bond by the time this dialogue

began, at 77-04 (77.125).  Nevertheless, Im repeatedly referred to a nonexistent seller from

whom he was supposedly still negotiating to buy the bond at 78, and Trader A agreed to pay 78

in response to Im's fabricated account of this purportedly ongoing negotiation.  Among other

fictitious details that Im concocted, he falsely claimed or suggested that (i) 78 was the best price

that he thought he could get; (ii) the seller was threatening to sell the bonds elsewhere if Im did

not buy them at 78; (iii) Nomura would only be compensated if Trader A agreed to pay 4 ticks

above 78; and (iv) he was doing Investment Manager A a favor by agreeing to accept only 4

ticks in compensation.

   50. The combined effect of Im's lies was that he made 32 ticks, or a full point, in

profit on this second trade, equal to $60,000, rather than the 4 ticks, or $7,500, that Trader A

believed Investment Manager A was paying.  Im's material misrepresentations and deliberate

deception generated $52,500 in additional, fraudulent profit for the CMBS desk on this

transaction at the expense of Investment Manager A.

   51. As shown above, Im's misrepresentations were material because, among other

things, the price information and compensation amount that Im lied about, coupled with his

fabricated account of a purportedly ongoing negotiation with the seller, were important to and

influenced Investment Manager A's negotiation strategy and affected the price that Investment

Manager A agreed to pay, and paid, for the bond.

   **Trade 3**

   52. In Nomura's April 4, 2014 sale of a bond denominated MLCFC 2007-9 AJ to an

investment manager ("Investment Manager B"), Im defrauded Investment Manager B by lying to

a trader for Investment Manager B ("Trader B") and pretending to be negotiating to buy the bond

at a certain price when, in fact, he had already purchased the bond on the prior day at a lower

price.

   53. This transaction began as follows:  On April 3, 2014, Im purchased the bond from

another party at a price of 95.5.  On the next day, Im falsely told Trader B, who had expressed

interest in the bond, that Im was still engaged in negotiations with a seller of the bond and that

Im did not think that the seller would be willing to sell the bond to Nomura below 96, as follows:

> Trader B: re MLCFC 07-9, had another look and can do a lil better can show 95-24
> Im: k, be back . . . thank u . . . can show 96-24 again . . . doesnt seem like he
> gets to 95h . . .are u topping out there?

54.     Based on Im's concocted account of an ongoing negotiation with a seller that was

supposedly not willing to go below 96 for a bond that Im had already purchased the day before at

95.5, Trader B agreed to purchase the bond from Nomura at 96.5, thereby unwittingly providing

Nomura with a full point of compensation.  Im's misrepresentations about a fictional seller who

would not sell to Nomura for less than 96 led Trader B to increase Investment Manager B's bid

by 24 ticks, from 95-24 to 96-16 (96.5).

55.     Im's material misrepresentations and deliberate deception generated $75,375 in

additional, fraudulent profit for the CMBS desk on this transaction at the expense of Investment

Manager B.

56.     As shown above, Im's misrepresentations were material because, among other

things, the price information that Im lied about, coupled with his fabricated account of a

purportedly ongoing negotiation with the seller, was important to and influenced Investment

Manager B's negotiation strategy and affected the price that Investment Manager B agreed to

pay, and paid, for the bond.

**Trade 4**

57.     In Nomura's August 14, 2012 sale of a bond denominated CGCMT 2008-C7 AJ

to an investment manager ("Investment Manager C"), Im defrauded Investment Manager C by

lying to a trader for Investment Manager C ("Trader C") about Nomura's bids and purchase price

for the bond and the amount of compensation to be obtained by Nomura.

58.     In this transaction, while negotiating with Trader C for its purchase of the bond from Nomura, Im was simultaneously seeking to acquire the bond from its owner and made misrepresentations to Trader C about the price at which Im was bidding for the bond.  After submitting a bid of 76-24 (76.75) to the seller, Im told Trader C that Im was "in the hunt ~ 77." After the seller agreed to sell the bond to Nomura at 76-24, Im then lied to Trader C, telling him that "I buy at 77 w 76-20 cover/guy had order and wanted to improve but I boxed him out by lifting [*i.e.* buying the bond] at 77."  Im knew that his statement that Nomura's purchase price was 77 was false, as Im had already purchased the bond at 76-24 (or 76.75).  Im knew that his statement about "box[ing]" out a competing buyer by bidding for and buying the bond at 77 was also a lie, as Im never bid higher than 76-24 and bought the bond at that price.

59.     Im and Trader C then negotiated Investment Manager C's purchase price and the specific amount of Nomura's compensation for intermediating the trade, but those negotiations were based on the false premise that Nomura had paid 77 for the bond, eight ticks more than it had actually paid.  Im first pushed Trader C to pay eight ticks above 77, stating "77-08/at a min," and then pressed for an even higher price of 77-16.  Trader C ultimately agreed to pay 77-08, under the false impression, based on Im's misstatements, that by doing so, Investment Manager C would be paying Nomura eight ticks of compensation.  In fact, Nomura's compensation was sixteen ticks, twice the amount that Trader C believed he had agreed to pay based on Im's misrepresentations, as Nomura had actually paid only 76-24 for the bond.

60.     Im's material misrepresentations and deliberate deception generated $20,000 in additional, fraudulent profit for the CMBS desk on this transaction at the expense of Investment Manager C.

61.     As shown above, Im's misrepresentations were material because, among other things, the price information and compensation amount that Im knowingly lied about were important to and influenced Investment Manager C's negotiation strategy and affected the price that Investment Manager C agreed to pay, and paid, for the bond.

**Trade 5**

62.     In Nomura's April 26, 2010 purchase of a bond denominated CSMC 2006-C4 D from an investment manager ("Investment Manager D"), Im defrauded Investment Manager D by lying to a trader for Investment Manager D ("Trader D") about the price of the bid that Nomura received for the bond from the counterparty that was negotiating to buy the bond from Nomura.

63.     This transaction began as follows:  On the afternoon of the trading day immediately preceding the day of the purchase from Investment Manager D, other Nomura CMBS personnel were negotiating with another firm that was interested in purchasing the bond in question from Nomura and, in the course of those negotiations, a bid price of 12.5 (12-16) for the bond was discussed.

64.     On the next trading day, Im negotiated the purchase of the bond from Investment Manager D.  In the course of those negotiations, Im asked Trader D if he was "firm at 13" in Investment Manager D's offer to sell the bond.  Im then stated to Trader D that a "guy showed 11.5 bid/maybe can get him up slightly more but 13 prob not gonna work."  Based on that statement by Im, Trader D agreed to sell the bond to Nomura for a price of 11 and thereby provide, given Im's statement about an 11.5 bid for the bond, Nomura a spread of 0.5 points in compensation from Investment Manager D.

65.     Im's statement was false.  That same day, Nomura sold the same bond at 12-8

(12.25) to the firm with which it was negotiating on the prior trading day.  Between the time of Im's last communication with that counterparty, when a 12.5 bid was discussed, and Im's statement to Trader D that a "guy showed 11.5 bid" for the bond, the purchasing counterparty did not submit a bid at or near 11.5 to Nomura.  As a result of Im's knowingly false statement, Nomura received a total spread of 1.25 points in compensation from Investment Manager D for this virtually risk-free trade.

66.     Im's material misrepresentation and deliberate deception generated $150,000 in additional, fraudulent profit for the CMBS desk on this transaction at the expense of Investment Manager D.

67.     As shown above, Im's misrepresentation was material because, among other things, the price information that Im knowingly lied about was important to and influenced Investment Manager D's negotiation strategy and affected the price that Investment Manager D agreed to pay, and paid, for the bond.

**Trade 6**

68.     In Nomura's June 29, 2012 sale of a bond denominated MLMT 2006-C2 AJ to an investment manager ("Investment Manager E"), Im defrauded Investment Manager E by lying to a trader for Investment Manager E ("Trader E") about the price that Nomura paid for the bond.

69.     In this transaction, less than one hour after Im agreed to purchase a $5 million piece of the bond at a price of 78-16, Im resumed a conversation with Trader E about selling a $10 million piece of the same bond to Investment Manager E, with the other $5 million piece coming from Nomura's inventory.  In this conversation, Im pretended that he was still negotiating to purchase the additional $5 million piece of the bond and made multiple false statements to Trader E, as follows:

| | |
|---|---|
| Im: | mlmt 06-c2 aj…**best I can get the extra** 5 is 79 |
| … | |
| Trader E: | Mlmt will work |
| Im: | **k let me go get em** |
| Im: | so u want all 10 or just 5 |
| Trader E: | 10 yes |
| Im: | k **I bot the 5mm at 79** |
| Im: | u take 10mm at 79-8? |

(Emphasis added.)

70.     Im knew that the highlighted statements to Trader E were all false because he had already agreed to purchase the "extra [$]5" million piece of the bond and had done so at 78-16, not 79.

71.     Trader E did not, however, agree to pay 79-8 for the full quantity, part of which Nomura already held in inventory, as that trader did not want to pay Nomura what appeared to be, based on Im's false statements, eight ticks in compensation on the entire purchase.  In fact, Nomura's spread would have been 24 ticks had Trader E immediately agreed to Im's request that he pay 79-8 on the full amount, as Nomura had actually acquired the bond for 78-16 that day. Instead, on the basis of Im's false statement that Nomura had acquired the balance of the bond at 79, the two of them negotiated further about what Trader E believed would be Nomura's precise spread for the full quantity.  Showing the importance of the misrepresented price information and the specific amount of the spread, as well as Nomura's compensation, to Trader E in his negotiations with Im, the two of them ultimately settled on a net price of 79-4 for the entire quantity of the bond, as follows:

| | |
|---|---|
| Trader E: | I was thinking ¼ [point or 8 ticks] on the 5 u bot and then the 5 y owned got me to 79-4 |
| Trader E: | To me |
| Im: | so 79-6? |
| Im: | wtd avg? thats fine |
| Trader E: | 79-4 right? |
| Im: | oh so 79 and 79-8 |
| … | |

Im:             10mm 79-4 done
Trader E:        Great

72.     Despite Trader E's efforts to negotiate the best possible price for Investment

Manager E, Im's lies enabled Im to make a total of 20 ticks in profit on the trade, five times more

than the four ticks that Trader E believed he had agreed to pay. Im's material misrepresentations

and deliberate deception in this transaction generated $50,000 in additional, fraudulent profit for

the CMBS desk at the expense of Investment Manager E.

73.     As shown above, Im's misrepresentations were material because, among other

things, the price information that Im lied about was important to and influenced Investment

Manager E's negotiating strategy and affected the price that Investment Manager E agreed to

pay, and paid, for the bond.

**Trade 7**

74.     In Nomura's September 14, 2012 sale of a bond denominated CGCMT 2008-C7

AJ to an investment manager ("Investment Manager F") Im defrauded Investment Manager F by

lying to a trader for Investment Manager F ("Trader F") about the price that Nomura paid for the

bond.

75.     In this transaction, Im was simultaneously negotiating to buy the bond from one

counterparty and to resell the bond to Investment Manager F. Moments after Im agreed to

purchase the bond at a price of 81 from the owner, Im lied to Trader F about Nomura's purchase

price. Im falsely told Trader F that "we bot at 81-4" and added: "I am not gonna jam u…u think

81-16 is fair?" Im knew that his statement was false, as Im had agreed to purchase the bond for

four ticks less than what he represented to Trader F.

76.     Trader F did not, however, agree to pay 81-16. He and Im negotiated further

about Nomura's spread on the basis of Im's false statement that Nomura had acquired the bond

at 81-4, indicating the importance of the price information misrepresented by Im and the specific amount of the spread, and Nomura's compensation, to Trader F in his negotiations with Im. Trader F eventually agreed to pay 81-12 for the bonds, under the false impression that he was paying Nomura 8 ticks in compensation.

77.     In fact, despite Trader F's efforts to negotiate the best possible price for Investment Manager F, Im's lies enabled Im to make a total of 12 ticks in profit on the trade. Im's material misrepresentations and deliberate deception in this transaction generated $6,368.75 in additional, fraudulent profit for the CMBS desk at the expense of Investment Manager F.

78.     As shown above, Im's misrepresentations were material because, among other things, the price information that Im lied about was important to and influenced Investment Manager F's bidding strategy and affected the price that Investment Manager F agreed to pay, and paid, for the bond.

**Im's Compensation During The Fraud**

79.     While engaged in the misconduct described above, Im reaped significant gains in the form of incentive compensation from Nomura during the relevant period.

80.     Im received $3.79 million in discretionary bonuses from Nomura during this period.  The discretionary bonuses paid to Im were based in significant part on the performance of the CMBS desk, which was inflated through his fraud.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

81.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 80.

82.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of

securities and by the use of the means of instruments of transportation or communication in interstate commerce, knowingly, recklessly, or negligently has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

83.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

84.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 80.

85.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert,

has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Liability for Nomura's
Violations of Section 17(a) of the Securities Act**

87.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 83.

88.    Nomura, by virtue of the conduct alleged herein by Im, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means of instruments of transportation or communication in interstate commerce, knowingly,  recklessly, or negligently has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

89.    As alleged above, Im knowingly, recklessly, or negligently engaged in fraudulent conduct that resulted in violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]by Nomura.

90.    By engaging in the conduct alleged above, Im knowingly or recklessly provided substantial assistance to Nomura with respect to its violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

91.    By reason of the foregoing, Im is liable pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] for aiding and abetting Nomura's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Liability for Nomura's Violations
### of Section 10(b) of the Exchange Act and Rule 10b-5

92.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 86.

93.     Nomura, by virtue of the conduct alleged herein by Im, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

94.     As alleged above, Im knowingly or recklessly engaged in fraudulent conduct that resulted in violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Nomura.

95.     By engaging in the conduct alleged above, Im knowingly or recklessly provided substantial assistance to Nomura with respect to its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

96.     By reason of the foregoing, Im is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting Nomura's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### **I.**

Permanently enjoining Im from committing, aiding and abetting or otherwise engaging in conduct that would make him liable for the violations of the federal securities laws alleged in this Complaint;

### **II.**

Ordering Im to disgorge the ill-gotten gains he obtained as a result of the violations alleged in this Complaint, and ordering him to pay prejudgment interest thereon;

### **III.**

Ordering Im to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### **IV.**

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
       May 15, 2017

Respectfully submitted,

Andrew M. Calamari
Sanjay Wadhwa
George N. Stepaniuk
Richard Hong
Ladan F. Stewart
Chevon N. Walker
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0956 (Hong)
hongr@sec.gov

27