UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

– against –

JAMES H. IM,

Defendant.

---

**Case No. 17-CV-3613 (JPO)**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
<u>MOTION TO DISMISS</u>**

# <u>TABLE OF CONTENTS</u>

Page

STATEMENT OF FACTS ........................................................................................... 2

LEGAL STANDARDS ............................................................................................. 5

ARGUMENT ............................................................................................................. 6

I.     The Complaint Fails to State a Claim Under the Federal Securities Laws Because Statements Made by Mr. Im in the Course of Price Negotiations Are Not Fraudulent**.** ..................................................................................................... 6

       A.     The Complaint Fails to Allege any Misrepresentation or Omission of Material Fact. .................................................................................... 8

       B.     The Complaint Fails to Allege Scienter. .............................................. 13

            1.     The Complaint Fails to Allege that Mr. Im Had a Motive to Commit Fraud. ....................................................................... 14

            2.     The Complaint Fails to Allege Circumstances Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness. ................ 15

II.    The Complaint Fails to State a Claim for Aiding and Abetting Securities Fraud. .......... 16

CONCLUSION ......................................................................................................... 17

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)..................................................................................................14, 15

*In re Alliance Pharm. Corp. Sec. Litig.*,
   279 F. Supp. 2d 171 (S.D.N.Y. 2003)...........................................................................................9

*Ashchroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................................................5

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................................5

*In re Braskem S.A. Sec. Litig.*,
   --- F. Supp. 3d ---, 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017)............................................9

*In re Carter-Wallace, Inc., Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000).........................................................................................................15

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187, 201 (2d Cir. 2009).........................................................................................14, 15

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008).........................................................................................9

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)...........................................................................................................5

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).........................................................................................................8

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008).........................................................................................9

*Gavish v. Revlon, Inc.*,
   No. 00 Civ. 7291(SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)..................................10

## TABLE OF AUTHORITIES
(continued)

*Hutchison v. Deutsche Bank Sec. Inc.*,
 647 F.3d 479 (2d Cir. 2011).....................................................................................12

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)......................................................................................15

*Levitin v. PaineWebber, Inc.*,
 159 F.3d 698 (2d Cir. 1998).......................................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011)......................................................................................................8

*Merritt, Vickers, Inc. v. S.E.C.*,
 353 F.2d 293 (2d Cir. 1965) (citing 17 S.E.C. 459 (1944))......................................12

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)..............................................................................5, 14, 15

*Parnes v. Gateway 2000 Inc.*,
 122 F.3d 539 (8th Cir. 1997) .....................................................................................12

*In re ProShares Trust Sec. Litig.*,
 728 F.3d 96 (2d Cir. 2013)...........................................................................................8

*S.E.C. v. Apuzzo*,
 689 F.3d 204 (2d Cir.2012).........................................................................................16

*S.E.C. v. Aronson*,
 No. 11 Civ. 7033(JSR), 2013 WL 4082900, *superseded by statute on other
 grounds as stated in S.E.C. v. Wey*, No. 15-cv-7116 (PKC), 2017 WL
 1157140 (S.D.N.Y. Mar. 27, 2017) ............................................................................16

*S.E.C. v. Constantin*,
 939 F. Supp. 2d 288 (S.D.N.Y. 2013).........................................................................6

*S.E.C. v. Ginsburg*,
 362 F.3d 1292 (11th Cir. 2004) ..................................................................................8

*S.E.C. v. Global Telecoms Servs., L.L.C.*,
 325 F. Supp. 2d 94 (D. Conn. 2004)...........................................................................6

*S.E.C. v. Goble*,
 682 F.3d 934 (11th Cir. 2012) ...................................................................................12

*S.E.C. v. ICP Asset Mgmt., LLC*,
 No. 10 Civ. 4791(LAK), 2012 WL 2359830 (S.D.N.Y. June 21, 2012)...................6

## TABLE OF AUTHORITIES
(continued)

*S.E.C. v. Landberg*,
    836 F. Supp. 2d 148 (S.D.N.Y. 2011)...........................................................13, 14

*S.E.C. v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999).............................................................................6

*S.E.C. v. Pentagon Capital Mgmt. PLC*,
    612 F. Supp. 2d 241 (S.D.N.Y. 2009)..................................................................5

*S.E.C. v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013)...........................................................14, 15

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994).............................................................................15

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)..............................................................................5

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2009)...............................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    *551 U.S. 308 (2007)* ......................................................................................16

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).........................................................................................8

*United States v. Henry*,
    417 F.3d 493 (5th Cir. 2005) ...........................................................................3

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015)............................................................................13

*United States v. Shapiro et al.*,
    No. 3:15-cr-155-RNC (D. Conn. June 20, 2017), ECF No. 436 .............................13

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013)...............................................................................8

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ...................................................................... *passim*

*Zalewski v. Cicero Builder Dev. Corp.*,
    754 F.3d 95 (2d Cir. 2014)...............................................................................3

*Zerman v. Ball*,
    735 F.2d 15 (2d Cir. 1984)...............................................................................9

## TABLE OF AUTHORITIES
(continued)

**Statutes**

Securities Exchange Act of 1934 ............................................................. *passim*

Securities Act of 1933 ............................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 9 ..............................................................................5, 9, 14

Fed. R. Civ. P. 12 ...................................................................................5

Fed. R. Evid. 201 ...................................................................................3

Wayne M. Fitzgerald & Mark D. Paltrowitz, *Commercial Mortgage-Backed
   Securities*, inTHE HANDBOOK OF FIXED INCOME SECURITIES (Frank J. Fabozzi,
   ed., 8th ed. 2012) ("*Fixed Income*") ...........................................3, 11, 13

*S.E.C. Staff Accounting Bulletin No. 99*, 17 CFR Part 211 (Aug. 12, 1999) ................................12

## PRELIMINARY STATEMENT

James Im is a salesman.  For the majority of his 17-year career in the securities industry, and until the day the SEC filed this action, he sold commercial mortgage-backed securities ("CMBS") to some of the most sophisticated investors in the world.  These investors—at all times hedge funds or similar institutional investors—employed teams of highly skilled quantitative analysts to study each individual security.  They used proprietary valuation models to predict the future performance of the securities.  They conducted diligence on the commercial loans underlying the CMBS, oftentimes by inspecting the actual property securing those loans.  And after all of that, they bought from Mr. Im precisely the securities they intended to buy, at precisely the prices at which they were willing to buy them.

The complaint does not state a claim for securities fraud.  It does not allege that Mr. Im misrepresented the bonds' quality or the nature of the loans underlying the bonds.  There is no allegation that he attempted to predict future performance or told investors that they were receiving something other than what they actually received.  Even accepting for purposes of this motion that Mr. Im lied about the price at which he previously purchased or could sell the security, the date he purchased it, or the amount of his expected profit on the transaction, that is not fraud.  All material terms of the transaction were fully disclosed and subject to negotiation, and the investors received exactly what they bargained for.

A recent decision from the Seventh Circuit, *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), is directly on point.  In *Weimert*, the representative of a seller in a commercial real estate transaction intentionally misrepresented the positions of counterparties to his personal benefit.  The court held that these misstatements—the evidence of "deception"—"addressed not material facts or promises but rather parties' negotiating positions."  *Id.* at 364.  It was not a case, the court held, where a defendant deliberately understated expected losses on a security, or

falsified loan documents, forged signatures, or guaranteed impossible returns—or made other such misstatements that might give rise to a claim of fraud. *Id.* at 369-70. Rather, the alleged misstatements were related to the parties' negotiating positions, which the court held was an entirely different matter:

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. . . . [N]egotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance— should not be considered material for purposes of mail and wire fraud statutes.

*Weimert*, 819 F.3d at 357-58.

The *Weimert* court elaborated in the context of the sale of a car: a seller may quote his "best price" at $32,000, and the buyer his "final offer" of $28,000. The parties' statements are proven untrue—and price-altering—when the sale is consummated at $30,000. It is always the case that the buyer would like to have paid a lower price, and the seller to have obtained a higher price, but neither has committed fraud. *Id*.

So too here. Mr. Im is the figurative car salesman. He worked hard to get the best possible price from the most sophisticated investors in the world, allegedly by exaggerating or misstating certain facts *un*related to the nature or performance of the security. That may be objectionable to some, but it is not fraud. The complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

Mr. Im is 40 years old and was a trader on the CMBS desk of Nomura Securities International, Inc. ("Nomura") from 2009 to 2014. (Compl. ¶ 12.) Nomura is the New York-based affiliate of a Japanese banking entity, and an SEC-registered broker dealer. (Compl. ¶ 14.) Mr. Im's role as a CMBS dealer was to buy and sell CMBS. (Compl. ¶ 2.)

CMBS are debt securities, often referred to as bonds, for which the underlying assets are commercial mortgage loans, including those for the construction of factories, office buildings, apartment complexes, shopping malls, and other commercial-use properties. (Compl. ¶ 18.) Principal and interest payments on the underlying loans flow to CMBS investors. *See* Wayne M. Fitzgerald & Mark D. Paltrowitz, *Commercial Mortgage-Backed Securities*, at 697-98, *in* THE HANDBOOK OF FIXED INCOME SECURITIES (Frank J. Fabozzi, ed., 8th ed. 2012) ("*Fixed Income*").[1]  Compared to residential mortgage-backed securities ("RMBS"), CMBS are typically backed by fewer, larger-sized loans. *Id.* at 682; Ex. 32-1.

There is a significant amount of publicly available information concerning CMBS, and investors routinely conduct extensive due diligence prior to their investments. *Id.* at 692. Loan originators provide ratings agencies with data and loan files; ratings agencies review this data, perform site visits to properties securing the mortgage loans, and, of course, publish their ratings. *Id.*  In addition, issuers and underwriters of CMBS prepare documentation, including prospectuses and pooling and servicing agreements, which contain detailed information about the underlying loans serving as collateral for the deal. *Id.*  Finally, because of the "idiosyncratic nature of commercial real estate within CMBS transactions, bottom-up loan and property level analysis is necessary to understand the underlying credit and extension risks." *Id.* at 705.

Because CMBS bonds are not publicly listed, investors—typically investment advisors for managed funds or institutional investors—buy and sell CMBS through dealers like Nomura, and Mr. Im. (Compl. ¶ 22.)  As a trader on Nomura's CMBS desk, Mr. Im "often negotiated Nomura's purchase of CMBS from one customer and subsequent resale to another on the same

---

[1]      Courts routinely take notice of basic facts in sources such as treatises and almanacs. *Zalewski v. Cicero Builder Dev. Corp.*, 754 F.3d 95, 106 n.20 (2d Cir. 2014) (taking judicial notice of basic facts in treatise concerning colonial architecture); *United States v. Henry*, 417 F.3d 493, 494 (5th Cir. 2005).  *See also* Fed. R. Evid. 201(b)(2) (courts can take judicial notice of facts that "can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned.").  The *Fixed Income* treatise meets this standard.

day." (Compl. ¶ 23.)  Nomura was not an agent for the buying or selling party—at all relevant times and for all relevant transactions, it was a principal buying or selling for its own account. (Compl. ¶ 25.)  Profit accrued to Nomura on the difference, or spread, between the purchase and sale price on these transactions.  (Compl. ¶ 24.)

The complaint identifies seven trades, from 2010 to 2014, during which Mr. Im allegedly made false statements to investors regarding Nomura's purchase or expected resale price of CMBS bonds.  (Compl. ¶¶ 42-78.)  These statements fall into one of two categories, according to the SEC.  In the first, Mr. Im allegedly discussed with an investor a dollar amount to be paid "on top" of the price at which Nomura previously purchased the bond.  The SEC alleges that Mr. Im then exaggerated Nomura's purchase price, thus increasing the spread and the amount of Nomura's profit.  (Compl. ¶ 27.)  In the second category, Mr. Im never discussed any spread, but allegedly over- or understated the prices at which Nomura purchased the bonds.  This, according to the SEC, impacted the investor's "all in" price and increased Nomura's profits.  (Compl. ¶ 29.) In neither case, however, does the SEC allege that Mr. Im misrepresented the nature of the security or its performance, or said anything about the underlying commercial mortgage loans. Nor does the SEC allege that the buyer received anything other than the security it intended to purchase at the price it was willing to pay, or that the seller received anything other than the precise amount of money it expected to receive.  Rather, the SEC alleges that Mr. Im's statements "had a material impact on the counterparties' decision-making process and price negotiations, leading them to bid and pay higher (or offer and obtain lower) prices for the securities than they would likely have done if Mr. Im had not misrepresented, in various ways, the size of the spread that Nomura was obtaining for intermediating the trades at issue."  (Compl. ¶ 38.)

The SEC commenced this action on May 15, 2017.  It asserted claims for (1) violations of Section 17(a) of the Securities Act, (2) violations of Section 10(b) of the Exchange Act and Rule 10b-5, and (3) aiding and abetting violations of those provisions by Nomura.  (Compl. ¶¶ 81-96.)

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must push the SEC's claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While the Court is constrained to accept the complaint's allegations as true at this stage, this principle is "inapplicable to legal conclusions" or to "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *accord S.E.C. v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 257 (S.D.N.Y. 2009) (providing that "mere 'conclusions of law or unwarranted deductions' need not be accepted") (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)).  The Court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then consider whether the remaining factual allegations in the complaint "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 681.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss," and therefore must comply with Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The complaint must state with particularity the circumstances constituting fraud or mistake, including the allegedly fraudulent statements and an explanation of why the statements were fraudulent. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted).

5

The elements of a claim under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and Rule 10b-5 are essentially the same, and "[m]any courts—including the Second Circuit—analyze claims under both statutes together."  *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 302-03 (S.D.N.Y. 2013) (quoting *S.E.C. v. ICP Asset Mgmt., LLC*, No. 10 Civ. 4791(LAK), 2012 WL 2359830, at *2 (S.D.N.Y. June 21, 2012)).  Both "prohibit devices or schemes to defraud, the obtaining of money by means of materially false or misleading statements, and transactions or courses of business that act as a fraud or deceit."  *S.E.C. v. Global Telecoms Servs., L.L.C.*, 325 F. Supp. 2d 94, 111 (D. Conn. 2004).  The elements of each include (1) a material misrepresentation or omission as to which one had a duty to speak, or the use of a fraudulent device; (2) made with scienter; and (3) made in connection with the purchase or sale of securities.  *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

## ARGUMENT

### I.  The Complaint Fails to State a Claim Under the Federal Securities Laws Because Statements Made by Mr. Im in the Course of Price Negotiations Are Not Fraudulent.

The Complaint should be dismissed for the basic reason that the alleged misstatements are not fraudulent.  The statements themselves are not material, and the allegations of fraudulent intent are too conclusory to satisfy the heightened pleading standard here.

The Seventh Circuit's recent decision in *Weimert* is highly instructive in distinguishing fraud from negotiation.  In *Weimert*, a bank vice president (Weimert) was tasked with negotiating the sale of the bank's share in a commercial real estate development in Texas, and successfully arranged a sale price that far exceeded the bank's target.  819 F.3d at 353. Perceiving an opportunity for personal gain, Weimert persuaded two potential buyers that he would be a useful partner; both buyers included in their offer letters to the bank a term providing that Weimert would buy a minority interest in the property.  *Id.* at 360-61.  Weimert also

deliberately misled his board and bank officials to believe that the buyer would not close the deal

if he were not included as a minority partner.  *Id*. at 361.  The bank agreed to the arrangement,

and also to pay Weimert an unusual bonus to enable him to buy that minority interest.  *Id.* at 353.

Weimert was charged with wire fraud, and convicted.  *Id*. at 363-64.  The Seventh Circuit

reversed, and ordered a judgment of acquittal, finding that Weimert's actions "were sharp and

self-interested, but they did not amount to wire fraud." *Id*. at 370.  The *Weimert* Court reasoned:

> Buyers and sellers negotiate prices and other terms.  To state the obvious, they
> will often try to mislead the other party about the prices and terms they are willing
> to accept.  Such deceptions are not criminal.
>
> To take a simple example based on price, suppose a seller is willing to accept
> $28,000 for a new car listed for sale at $32,000.  A buyer is actually willing to
> pay $32,000, but he first offers $28,000.  When that offer is rejected and the seller
> demands $32,000, the buyer responds: "I won't pay more than $29,000."  The
> seller replies: "I'll take $31,000 but not a penny less."  After another round of
> offers and demands, each one falsely labeled "my final offer," the parties
> ultimately agree on a price of $30,000.  Each side has gained from deliberately
> false misrepresentations about its negotiating position.  Each has affected the
> other side's decisions.  If the transaction involves interstate wires, has each
> committed wire fraud, each defrauding the other of $2,000? Of course not.
> But *why* not?
>
> . . .
>
> [N]egotiating parties, and certainly the sophisticated businessmen in this case, do
> not expect complete candor about negotiating positions, as distinct from facts and
> promises of future behavior.  Deception about negotiating positions—about
> reserve prices and other terms and their relative importance—should not be
> considered material for purposes of mail and wire fraud statutes.

*Id*. at 357-58.

Consistent with this reasoning, as discussed below the alleged misstatements here cannot

be considered fraudulent because they were not material and were not made with the requisite

fraudulent intent.

7

A.     The Complaint Fails to Allege any Misrepresentation or Omission of Material
       <u>Fact</u>.

Section 17(a) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b-5 provide

that the actionable misrepresentations or omissions must be material—that is, "there must be a

substantial likelihood that the disclosure of the omitted [or misstated] fact would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).   To be considered material, the SEC must

plausibly allege a *substantial likelihood* that a reasonable investor would find the omission or

misrepresentation important in making an investment decision.  *United States v. Vilar*, 729 F.3d

62, 89 (2d Cir. 2013); *see also S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004)

("Materiality is proved by showing a substantial likelihood that the disclosure of the omitted fact

would have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available.") (quotation marks omitted).  But, "it is *not* sufficient to allege

that the investor might have considered the misrepresentation or omission important." *Ganino v.*

*Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (emphasis added).

Accordingly, and as the Second Circuit has recently advised, "the materiality hurdle

remains a meaningful pleading obstacle . . . . In fact, the Supreme Court has been 'careful not to

set too low a standard of materiality.'" *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d

Cir. 2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).   The

question of materiality is an objective one, involving the significance of the statement to a

reasonable investor under the circumstances that the statement was made.  *Northway*, 426 U.S. at

449.  Thus, whether a particular statement is material must be determined upon the facts as of the

time of the transaction, and not on the basis of hindsight.  *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 191 (S.D.N.Y. 2003).

It is for these reasons that securities fraud claims are routinely dismissed for lack of materiality.  *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998) (quoting *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984)) (affirming dismissal of Section 10(b) claim because, as a matter of law, a reasonable investor would not be misled by defendant's omission that defendant earns (or may earn) money from collateral posted in short-sale transactions); *accord In re Braskem S.A. Sec. Litig.*, --- F. Supp. 3d ---, 2017 WL 1216592, at *13 (S.D.N.Y. Mar. 30, 2017) (granting, in part, defendants' motion to dismiss Section 10 and 20 claims where alleged misstatements were inherently immaterial); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612-13, 616-17 (S.D.N.Y. 2008) (granting motion to dismiss Section 10, 11, and 12 claims where alleged omissions were immaterial as a matter of law; *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187 (S.D.N.Y. 2008) (dismissing investor-plaintiffs' Section 10(b) and Rule 10b-5 claims because, in addition to failing to plead scienter, plaintiffs failed to adequately plead materiality of misstatements).

That principle compels dismissal here, for at least six reasons.

First, the complaint fails to satisfy Rule 9(b).  The complaint's allegations regarding materiality are scant, inconsistent, and conclusory.  In its few passing references to materiality, the complaint alleges that "CMBS are illiquid securities and the market for them is opaque," and that investors looking to develop their own bids rely on CMBS dealers who decide "if, when and to whom to disclose the bids and offers that they receive or make."  (Compl. ¶ 31.)  That is the sum and substance of the complaint's allegations of materiality.  There is no allegation that

investors actually viewed the alleged misstatements as important to their investment decisions.[2]
Nor is there a allegation concerning the "fraudulent" profit supposedly generated by Mr. Im as a
percentage of the total price paid for the security, a fatal omission given the requirement that
plaintiff plead materiality in light of the "total financial picture." *Gavish v. Revlon, Inc.*, No. 00
Civ. 7291(SHS), 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing complaint
where plaintiff did not "even attempt to approximate the magnitude or degree of those
misstatements in relation to [the defendant's] total financial picture.").

Second, the complaint's assertions regarding the "opaqueness" of the CMBS market (*id.*)
actually undermine the claim of materiality.  The complaint alleges that the "CMBS secondary
market was opaque because there was no contemporaneous public dissemination of trade prices,
and purchasers and sellers of CMBS had no reliable way to learn the prices that dealers like
Nomura brokers paid and received unless the dealers disclosed them while negotiating a trade."
(Compl. ¶ 20.)  The complaint, therefore, uses the term "opaque" as a cloak-and-dagger synonym
for "not publicly listed."

But the fact that CMBS are not publicly listed does not make a misstatement material.
Quite the opposite.  The trades at issue in this action were principal-to-principal transactions with
highly sophisticated counterparties.  (Compl. ¶ 25.)  And precisely *because* CMBS are not listed
publicly, such investors apply—and uniquely benefit from—a high level of real estate expertise,
local market intelligence, structural modeling capabilities, and fixed income knowledge to make

---

[2]     That omission is hardly surprising given that the counterparties here are indisputably seasoned CMBS
investors.  The notion that these counterparties—like all transaction parties—would have rather paid less for
securities they purchased, or obtained a higher price on securities they sold, is axiomatic; it does not affect the
materiality analysis. *See, e.g., Weimert*, 819 F.3d at 357 (fraud not present in negotiation even though "[e]ach side
has gained from deliberately false misrepresentations about its negotiating position. Each has affected the other
side's decisions.").

informed investment decisions in this space.[3]   *Fixed Income* at 703.  Indeed, to determine the valuation of a particular bond, CMBS investors typically employ sophisticated modeling and rely on a "combination of observed historical performance, real estate market trends, and the [investor's] experience and judgment."  *Id.* Were CMBS prices listed publicly, these variables would be "baked into" the market price, and the strategic advantage of the CMBS investor diminished.

Third, the allegations concerning CMBS liquidity—to the extent liquidity has any relevance to materiality—are contradictory.  The complaint first says that that "CMBS were illiquid securities, many of which had been discounted significantly as a result of the 2008 financial crisis."  (Compl. ¶ 19.)  It then says that "[s]tarting in 2010 [the beginning of the relevant time period for this action], as the economy began to recover, trading volume in the secondary markets for CMBS increased significantly," suggesting in no uncertain terms that the market for CMBS was, in fact, *liquid* at all relevant times.  *Id.*  Still later, the complaint reverts back to describing CMBS as illiquid to support its contention that Mr. Im's statements were material.  (Compl. ¶ 31.)

Fourth, the SEC does not—because it *could* not—allege that any CMBS investor, anywhere, factors into his or her complex valuation analyses the unverified, volunteered statements of a dealer regarding the price a dealer paid, or could later sell, a CMBS bond, or the profit Nomura made on a transaction.  Nor would a reasonable investor sitting across the table from a dealer in a principal-to-principal transaction—one in which the dealer had every incentive to maximize its profit and the investor had no right to know the amount of the dealer's profit—

---

[3]      Unlike Nomura, who typically would not buy and hold CMBS (Compl. ¶ 25) for lengthy periods of time, it is incumbent on CMBS investors to first conduct extensive diligence on collateral underlying a particular bond before buying or selling to understand the associated risks. *Fixed Income* at 705.  As such, Mr. Im's counterparties, nearly without exception, would have had more information than Mr. Im regarding bond valuation.

consider the statements at issue to have "significantly altered the total mix of information" relevant to that investor.  This is particularly true where, as here, none of the markups made by Mr. Im are alleged to have exceeded the SEC's own guidance on materiality.  *See S.E.C. Staff Accounting Bulletin No. 99*, 17 CFR Part 211 (Aug. 12, 1999) ("The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption" of materiality); *see also Merritt, Vickers, Inc. v. S.E.C.*, 353 F.2d 293, 294 n.3 (2d Cir. 1965) ("A mark-up of 5% or less over the current market is considered fair." (citing 17 S.E.C. 459 (1944)).

Fifth, and relatedly, Mr. Im's alleged misstatements in fact implicated such a tiny percentage of the overall transaction that a reasonable investor could not consider them to be material.  Of the seven trades in the complaint, the discrepancy attributable to Mr. Im's statements range from 0.125% to 1.000%.  (Compl. ¶¶ 44, 50, 54, 59, 64-65, 72, 77.)  Courts have rejected as immaterial statements impacting similarly modest portions of larger transactions.  *See*, *e.g.*, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011) (affirming dismissal of claims brought under Sections 11, 12, and 15 of the Securities Act, finding alleged misstatement of $52 million not "material" relative to $1.1 billion investment portfolio); *Parnes v. Gateway 2000 Inc.*, 122 F.3d 539 (8th Cir. 1997) (holding alleged misrepresentations, which amounted to 2% of total assets, were immaterial as a matter of law).

Finally, this Court should not entertain the SEC's broad reading of materiality to include misrepresentations on *price*, which influence an investor's choice of broker-dealer and *not* an investor's purchase or sale of a security.  *S.E.C. v. Goble*, 682 F.3d 934, 944 (11th Cir. 2012) (holding, in the context of determining materiality, "a misrepresentation that would only influence an individual's choice of broker-dealers cannot form the basis for § 10(b) securities fraud liability.").

The Second Circuit's 2015 decision in *United States v. Litvak* does not alter this analysis. 808 F.3d 160 (2d Cir. 2015). In *Litvak*, a former trader of RMBS was tried and convicted of securities fraud for misstating pricing information to investors in the course of selling RMBS bonds. The Second Circuit reversed, holding that the trial court erred in excluding expert testimony relating to, among other things, the insignificance of broker-dealer acquisition price to the RMBS investor and minor price variances resulting from the defendant's alleged misstatements. *Id.* at 181. And while the Second Circuit declined to rule that, as a matter of law, no reasonable juror could find the defendant's misstatements to be material, it did so on a record that included testimony from several investors that the defendant's misstatements were "important" to them. *Id.* at 176. As discussed, no such allegations are present here.[4]

Moreover, the *Litvak* case involved RMBS, a distinct financial product collateralized by a far greater number of loans. There, statistical sampling, as opposed to individual asset-level review, is necessary. CMBS, by contrast, involves far fewer loans, making asset-level review possible and, indeed, necessary. *See Fixed Income* at 681 (providing that loan concentration in CMBS "makes asset-level reviews much more important than other securitized products," such as RMBS, "in which the law of large numbers allows effective statistical sampling.").

B.     The Complaint Fails to Allege Scienter.

To state a claim for securities fraud, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *S.E.C. v. Landberg*, 836 F. Supp. 2d 148, 154 (S.D.N.Y. 2011)

---

[4]     Notably, Litvak would ultimately be acquitted on 9 of 10 counts asserted. *See* Judgment of Acquittal, *United States v. Litvak*, No. 3:13-cr-00019-JCH (D. Conn. May 2, 2017) ), ECF No. 544 ("The defendant was found not guilty on counts 1, 2, 3, 5, 6, 8, 9, 10, and 11 of the Indictment. IT IS ORDERED that the defendant is acquitted as to counts 1, 2, 3, 5, 6, 8, 9, 10, and 11 of the Indictment."). Similar charges against three employees trading at Nomura's RMBS desk were likewise largely unsuccessful. One of the defendants, Tyler Peters, was acquitted on *all* counts. *See* Judgment of Acquittal, *United States v. Shapiro et al.*, No. 3:15-cr-155-RNC (D. Conn. June 20, 2017), ECF No. 436. The second defendant, Michael Gramins, was acquitted on six counts, hung on two counts, and was only convicted on a single conspiracy count. *Id.*, Jury Verdict, (June 15, 2017) ECF No. 431. The third and final defendant, Ross Shapiro, was acquitted on eight counts and hung on one conspiracy count. *Id.*

(quoting *Novak*, 216 F.3d at 306); *accord Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ("[W]e must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'") (citation omitted).  This can be done by "alleging facts to show that defendants had both motive and opportunity to commit fraud," or "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Landberg*, 836 F. Supp. 2d at 154 (quoting *Novak*, 216 F.3d at 307); *accord S.E.C. v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013).  The SEC has done neither.

       1.      <u>The Complaint Fails to Allege that Mr. Im Had a Motive to Commit Fraud</u>.

The complaint is devoid of particularized facts giving rise to a strong inference of Mr. Im's fraudulent intent.  While the SEC alleges in conclusory fashion that Mr. Im was motivated to increase his discretionary bonus by inflating the performance of the CMBS desk  (Compl. ¶¶ 5, 32, 80), this alone is plainly insufficient to demonstrate fraudulent motive.  A motivation for financial gain is "possessed by virtually all corporate insiders."  *Novak*, 216 F.3d at 307.  And the Second Circuit has expressly rejected the types of generalized motive allegations that the SEC advances in this action.  In *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, the court held that "the allegation that [defendants] had the requisite motive because they received bonuses based on corporate earnings and higher stock prices does not strengthen the inference of fraudulent intent."  553 F.3d 187, 201 (2d Cir. 2009).  As the *ECA* Court explained,

> [i]f scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.  '[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'

*Id.* (second alteration in original) (quoting *Acito*, 47 F.3d at 54); *see also Novak*, 216 F.3d at 307 (rejecting plaintiff's theory that motive was demonstrated by "the desire to maintain a high stock price in order to increase executive compensation").

The general allegation that Mr. Im was motivated to defraud investors because his discretionary bonus was tied, "in part," to the seven trades identified in the complaint is simply implausible. The motive to earn a bonus or to realize financial gain is common to all employees and hardly gives rise to a "strong inference" of scienter. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

> 2. The Complaint Fails to Allege Circumstances Giving Rise to a Strong
> Inference of Conscious Misbehavior or Recklessness.

Because the SEC has failed to demonstrate a motive to commit fraud, it "must produce a *stronger* inference of recklessness" or conscious misbehavior. *Syron*, 934 F. Supp. 2d at 631-32; *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."). At the pleading stage, the SEC "must allege reckless conduct which is, at a minimum, 'highly unreasonable and 'represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2009) (quoting *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). "A complaint will survive," the Supreme Court has held, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

That is not the case here.  Far from an "extreme departure from the standards of ordinary care," Mr. Im's alleged conduct is what the *Weimert* court described as perfectly normal—even expected—in a transaction between sophisticated parties.   And the allegation that Mr. Im *disclosed to a separate counterparty* that he told "Trader A" that he misstated the price that Nomura actually paid for a particular bond (Compl. ¶ 45), even accepted as true, is evidence that he was engaging in behavior that he viewed as widely understood (and certainly not concealed) in the CMBS market.  *See Weimert*, 819 F.3d at 358 ("The better answer" is that "[d]eception about negotiating positions" should not be considered fraud).

## II.     The Complaint Fails to State a Claim for Aiding and Abetting Securities Fraud.

In addition to primary securities law violations, the SEC alleges that Mr. Im aided and abetted those same violations by Nomura. To establish aiding and abetting securities fraud, the SEC must plead and prove "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir.2012) (internal quotation marks and citations omitted).

The claims for aiding and abetting should be dismissed because there is no allegation of a separate, primary violation by Nomura.  Indeed, the complaint fails to assert *any* allegation that Nomura itself committed a fraud separate and apart from Mr. Im's conduct.  That alone is dispositive.  *See   S.E.C. v. Aronson*, No. 11 Civ. 7033(JSR), 2013 WL 4082900, at *10 (dismissing Section 10(b) and Rule 10b-5 claims because "the misconduct underlying [the entities'] alleged primary violations are identical to those for which" the court held Aronson

primarily liable under the federal securities laws), *superseded by statute on other grounds as stated in S.E.C. v. Wey*, No. 15-cv-7116 (PKC), 2017 WL 1157140, at *22 (S.D.N.Y. Mar. 27, 2017)).

Accordingly, the aiding and abetting claims against Mr. Im must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant James Im respectfully requests an Order dismissing this action with prejudice under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: New York, New York
      August 7, 2017

Respectfully submitted,

/s/  *Matthew D. Ingber*
Matthew D. Ingber
Michael Martinez
Robert W. Hamburg
Ilana D. Cohen
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
MIngber@mayerbrown.com
Michael.Martinez@mayerbrown.com
RHamburg@mayerbrown.com
ICohen@mayerbrown.com

*Counsel for Defendant James Im*