UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――

SECURITIES AND EXCHANGE
COMMISSION,

                           Plaintiff,                     17-CV-3613 (JPO)

             -v-                        OPINION AND ORDER

JAMES H. IM,

                           Defendant.
―――――――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

       The Securities and Exchange Commission ("SEC") brings this action against James H. Im, co-head of the commercial mortgage-backed securities ("CMBS") trading desk for Nomura Securities International. The SEC claims that Im committed securities fraud, in violation of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5, by providing false or misleading information to prospective buyers or sellers of mortgage bonds. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Im now moves for summary judgment. For the reasons that follow, Im's motion is denied.

**I.     Background**

       As a CMBS trader, Im facilitated transactions between investors seeking to buy and sell mortgage bonds. To maximize profits for Nomura, Im, like other CMBS traders, sought "to buy bonds at the lowest price an investor will accept" and then to sell those bonds "at the highest price [another] investor will pay." (Dkt. No. 62 ¶ 43.) The SEC's claims revolve around the manner in which Im allegedly sought to do this. The SEC highlights seven transactions, dating from 2010 through 2014, in which it contends that Im misrepresented whether and at what price Nomura had bought or could sell bonds. (Dkt. No. 1 ¶¶ 43–78.)

Im concedes that, in six of these transactions, he inflated the price at which Nomura had purchased a bond or pretended that Nomura was still trying to purchase a bond when it in fact had already purchased the bond at a favorable price. As an example, on April 4, 2014, Im informed an investor seeking to purchase a bond that the current owner of the bond "doesn't seem like he gets to 95h," meaning that the owner would not sell at any price lower than 96. (Dkt. No. 62 ¶ 121.) Shortly thereafter, the investor raised his bid for the bond from 95.75 to 96.5, and Im sold the bond at that higher price. (Dkt. No. 62 ¶¶ 122–23.) The 96.5 sale price afforded Nomura one full point in profit, as Nomura had in fact purchased the bond at issue on the previous trading day, at a price of 95.5. (Dkt. No. 62 ¶ 120.) The other five transactions for which Im concedes he lied mirror the April 4, 2014 transaction.

Im does not concede that he lied to facilitate the April 26, 2010 transaction highlighted by the SEC. (Dkt. No. 62 ¶ 131.) In that transaction, an investor asked Im if Nomura would purchase a particular bond at a price of 13. (Dkt. No. 59-21.) Im replied that Nomura had received a bid of 11.5 for the bond and suggested that he "maybe [could] get [the bidder] up slightly more but 13 prob not gonna work." (*Id.*) Within a minute of Im's citing the 11.5 bid, the investor agreed to sell the bond to Nomura for 11. (*Id.*) Later that same day, Nomura sold the bond to the bidder for 12.25, securing 1.25 points in profit. (Dkt. No. 62 ¶ 136.) In negotiating to buy the bond, Im neglected to inform the investor that on the previous trading day, the bidder had told Im's colleagues that he could "probably get to 12" and discussed a bid price of 12.5. (Dkt. No. 62 ¶ 133.) Im and the SEC dispute the significance of the bidder's earlier discussion with Im's colleagues. (Dkt. No. 62 ¶ 136.)

The SEC estimates that, among its seven highlighted transactions, Im's acknowledged and supposed misrepresentations generated an additional $366,743 in profits for Nomura.

(Dkt. No. 1 ¶ 41.) Although Im's compensation at Nomura was not linked to his individual performance as a trader, it was linked to the overall performance of Nomura's CMBS trading desk. (Dkt. No. 59-9 at 90:7–12.) And under Im's leadership, the trading desk exceeded its revenue goals, in one year earning $36 million in revenue when Nomura hoped to earn between $25 and $30 million. (Dkt. No. 59-9 at 90:2–4.) From 2010 to 2014, the time period in which Im undertook the seven transactions, Im received a cumulative $3.79 million in discretionary bonuses. (Dkt. No. 62 ¶ 149.) Im disputes whether his statements generated additional profits for Nomura and thus additional compensation for himself. (*Id.*)

Based primarily on the factual dispute as to whether his statements generated additional profits, Im filed a motion to dismiss the SEC's claims in 2017. (*See* Dkt. No. 17.) The Court denied the motion. (*See* Dkt. No. 22.) Having completed discovery, Im revives the arguments made in his motion to dismiss to seek summary judgment. (*See* Dkt. No. 55.).

**II.     Legal Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14-cv-4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-cv-5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The Court must view all evidence "in the light

most favorable to the non-moving party and draw all reasonable inferences in its favor," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citation omitted).

## III. Discussion

To prevail on its securities fraud claims under § 17(a)(1) and Rule 10b-5, the SEC must establish that Im "(1) made a material misrepresentation or a material omission as to which he had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale" of the mortgage bonds. *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotation marks and citation omitted) (describing the elements of a Rule 10b-5 claim and then characterizing the elements of a § 17(a) claim as "essentially the same"). With respect to claims brought under § 17(a)(2) and (a)(3), "no showing of scienter is required." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Defendant moves for summary judgment on the SEC's claims, arguing that the SEC cannot show falsity as to Im's April 26, 2010 statement, materiality for any of Im's statements, or scienter for any of Im's statements. Im also argues that, because the SEC cannot establish a primary violation of securities law, its claim that he aided and abetted Nomura's fraud must fail. Each argument is discussed in turn.

### A. Whether the April 26, 2010 Statement was False or Misleading

Im challenges whether the SEC can show that his April 26, 2010 statement was false without definitively establishing that Nomura had not received a bid of 11.5 that same day. (Dkt. No. 57 at 26.) Noting that bids "clear" at the end of each trading day, Im hypothesizes that the bidder who had discussed a 12.5 purchase price on the previous trading day might have restarted negotiations on the day of the sale with an 11.5 bid. (*Id.*; Dkt. No. 63 at 12.) Although Im resists the inference, reasonable jurors could conclude from the bidder's comment on the

4

previous trading day that he could "probably get to 12," and from his ultimate purchase of the bond for 12.25, that the bidder would not have bid as low as 11.5 on the day of the sale. Furthermore, reasonable jurors could conclude that, even if the bidder restarted negotiations with an 11.5 bid, Im's statement that the bidder "maybe" could be convinced to pay "slightly more" than 11.5 was misleading because Im omitted mention of the previous negotiations. *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175–77 (2d Cir. 2020) (discussing when statements are misleading by omission). Im's falsity argument fails.

> B. **Whether Im's Misrepresentations Would have been Material to a Reasonable Investor**

Im also challenges whether the SEC can show that his misrepresentations would have been material, or "important to a reasonable investor." *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019). In so doing, Im emphasizes that, during discovery, no investor definitively stated that they would have been able to secure a better price had Im told the truth or suggested that they would have "walked away" from the transaction had they known Im was lying. (Dkt. No. 63 at 4.) This, however, is not the standard for identifying materiality, and Im's supposed evidentiary hurdles have no basis in the governing law. To the contrary, the Second Circuit recently explained that "testimony from a broker-dealer's counterparties" that they viewed a misrepresentation as "important" or would have negotiated differently but for the misrepresentation "can constitute sufficient evidence of materiality to support a [claim of] securities fraud." *Gramins*, 939 F.3d at 446.

During discovery for this case, the SEC developed testimony in which Im's investor counterparties referred to general representations about bond prices and ownership, as well as Im's specific statements, as "important." (Dkt. No. 62 ¶ 106.) Several specified that representations of this kind, as well as Im's specific statements, would or did affect their

negotiation strategy for the purchase or sale of a bond. (*Id.*) One investor stated that "it is highly unlikely that [he] would have bid as high" for a particular bond had he known the actual, lower price at which Nomura had already purchased it. (Dkt. No. 62 ¶ 107.) He explained that the "full point spread for Nomura was too much compensation for th[e] trade and much higher than [he] would have expected to pay." (*Id.*) This testimony complements other of the SEC's evidence showing that investors rely not only on quantitative models but also on "market color," including information about bond prices, when deciding the price at which to buy or sell a bond. (Dkt. No. 62 ¶ 89.)

The SEC has adduced enough evidence through discovery to earn "the right to advance its theory of materiality" at trial. *Gramins*, 939 F.3d at 446. Im, of course, has his own right to advance a conflicting theory of materiality at trial. The jury can "accept whichever theory of materiality it [finds] more persuasive in light of the testimony and other evidence before it." *Id*.

### C.     Whether Im Acted with Scienter

Im contests, too, whether the evidence adduced during discovery shows that he made his misrepresentations with scienter, the requisite mental state to sustain the SEC's § 17(a)(1) and Rule 10b-5 claims. (Dkt. No. 57 at 21.) To establish scienter, the SEC must show that Im's misrepresentations were "made with the intent to deceive, manipulate, or defraud" or were made with "reckless disregard for the truth" and constituted "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Frohling*, 851 F.3d at 136 (internal quotation marks and citation omitted); *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit.").

6

Repurposing his materiality argument, Im reasons that he could not have made his misrepresentations with an intent to defraud because reasonable investors do not accord weight to a trader's statements about bond prices and therefore are categorically incapable of being defrauded by such statements. This argument fails for at least three reasons. First, it nestles the materiality issue, a matter appropriate for resolution by a jury, inside the determination of Im's mental state, itself a determination that commonly "withstand[s] summary judgment" because "[w]hether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (internal quotation marks and citation omitted). Second, reasonable jurors could infer from Im's own testimony that he believed his misrepresentations would change investor conduct and yield more favorable bond prices for Nomura. For instance, Im testified that he lied when doing so "would be effective" as a "strategy" for negotiating the price at which Nomura would buy or sell a bond. (Dkt. No. 62 ¶ 105.) Third, the SEC has marshaled evidence of Im's "motive and opportunity to commit fraud": the "direct" link between Im's discretionary bonuses and the performance of the CMBS desk, which Im could inflate through misrepresentation. *SEC v. Im*, No. 17-cv-3613, 2018 WL 840094, at *3 (S.D.N.Y. Feb. 12, 2018) (internal quotation marks and citation omitted).

Furthermore, even if the SEC could not establish Im's intent to defraud, it certainly has uncovered enough evidence to argue at trial that Im's lies were highly unreasonable and an extreme departure from the standards of ordinary care. Nomura's company policies and trainings, evidence indicative of what constitutes reasonable practice and ordinary care among traders, instructed employees like Im, "Do Not Lie," and, "All communications must be truthful, . . . must not omit material facts and must not use language that is misleading, promising, or

7

exaggerated." (Dkt. No. 62 ¶ 101–02.) Moreover, a trader employed by one of Nomura's competitors was criminally indicted in 2013 for "fraudulently misrepresent[ing] to . . . counterparties the costs . . . of acquiring" or reselling certain securities in 2009 and 2011. *United States v. Litvak*, 808 F.3d 160, 166 (2d Cir. 2015). That this conduct contemporaneous with or preceding Im's statements was criminally prosecuted is indicative of its unreasonableness. Indeed, the Second Circuit has held that when this kind of conduct postdates the 2013 indictment, as Im's April 4, 2014 trade did, there is "strong evidence" not just of recklessness but of the defendant's "consciousness of wrongdoing." *Gramins*, 939 F.3d at 455. Summary judgment on this issue must be denied.

### D. Whether Im Aided and Abetted Nomura's Securities Fraud

Finally, Im argues that he is entitled to summary judgment on the aiding and abetting claims because, if the SEC cannot show falsity, materiality, and scienter, the SEC cannot establish any securities law violation by Nomura for which Im would be secondarily liable. (Dkt. No. 57 at 26.) Having rejected Im's other arguments, the Court necessarily rejects this argument.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 55.

SO ORDERED.

Dated: August 24, 2020
     New York, New York

_____
J. PAUL OETKEN
United States District Judge

8